**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

|  |  |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, 59 Route 10, East Hanover, New Jersey 07936, <br><br> *Plaintiff*, <br><br> v. <br><br> AARON M. FREY, in his official capacity as ATTORNEY GENERAL OF MAINE, 6 State House Station, Augusta, ME 04333, <br><br> *Defendant*. | Civil Action No. |

**VERIFIED COMPLAINT
WITH REQUEST FOR IMMEDIATE RELIEF**

Novartis Pharmaceuticals Corporation (Novartis) brings this Complaint against Defendant Aaron M. Frey, in his official capacity as Attorney General of Maine, seeking to enjoin enforcement of certain provisions within Part P of Maine's L.D. 210, recently enacted as Chapter 103 of the Insurance Code. Novartis alleges as follows:

**PRELIMINARY STATEMENT**

1.      As a condition of having their drugs covered by Medicaid and Medicare Part B, pharmaceutical manufacturers must participate in the federal 340B Drug Pricing Program. The 340B Program requires manufacturers to offer to sell certain drugs at low prices to statutorily defined types of healthcare providers. Federal law creates and governs every detail of this program, including a comprehensive system of pricing rules, compliance obligations, and enforcement mechanisms.

2.      Federal oversight of the 340B Program is exclusive.  Congress mandated that the 340B Program be "superintended" by the federal Health Resources and Services Administration (HRSA), which is supposed to remain "in control" of its "drug-price prescriptions."  *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113–114 (2011).  In the 340B statute, Congress delineated the entities entitled to receive the 340B discount, the circumstances in which it must be given, and the penalties available when it is not.  And to give HRSA tight reins, Congress created a "unitary administrative and enforcement scheme" meant to "centralize[ ] enforcement in the government."  *Id*. at 119–120 (quotation omitted).

3.      The 340B Program has recently ballooned from a niche safety-net program affecting a small minority of healthcare providers into the largest healthcare program most people have never heard of.  Almost two-thirds of U.S. hospitals now derive revenue from the program, and 340B sales have increased tenfold since 2010.  Much of that growth has been fueled by the birth of a cottage industry of middlemen that help healthcare providers exploit the 340B Program and maximize revenue from it—in exchange for their share of the profits.

4.      Most relevant here are so-called "contract pharmacies": a type of for-profit pharmacy that contracts with a covered entity in order to expand the volume of discounts the covered entity may claim.  Contract pharmacies were not part of the 340B Program's original design.  But some covered entities claimed they could not participate in the program because they lacked an in-house pharmacy.  HRSA issued early guidance allowing covered entities to contract with one outside pharmacy, essentially to serve as its in-house pharmacy, and the 340B Program proceeded in that manner for many years.  But in 2010, HRSA began allowing covered entities to contract with an unlimited number of pharmacies—regardless of where they are located—and this move

changed the 340B Program dramatically. Some covered entities now purport to have hundreds of contract pharmacies in multiple states.

5.      Contract pharmacies are based on an accounting fiction in which covered entities and their contract pharmacies claim 340B discounts retroactively, long after the pharmacy has dispensed the drug to a customer. Their methods of doing so vary, but follow a similar theme. The predominant version of this methodology is called the "replenishment model." It works like this: Pharmacies purchase drugs at the commercial price and dispense them to customers in the normal course. Pharmacy customers pay standard, non-discounted prices—usually whatever co-pay their insurer generally charges them. Later, a third-party administrator culls through claims data and purports to match up the pharmacy's dispenses with covered entities' patient lists, applying an opaque set of criteria not known to manufacturers. If the third-party administrator finds what it claims to be a match—thereby earning itself a fee—the covered entity deems that unit eligible for the 340B discount even though the drug was purchased at the commercial price.

6.      To effectuate a retroactive discount under the replenishment model, the covered entity (or sometimes the contract pharmacy or third-party administrator) orders a second "replen-ishment" unit at the low 340B price for delivery to the pharmacy. The pharmacy then intermingles the 340B-priced unit in its inventory with commercially priced units, to be dispensed to whoever next walks in the door with that prescription—whether or not that person was a patient of the covered entity.

7.      Contract pharmacy arrangements therefore have nothing to do with patient access to drugs, or how much patients pay for their drugs. Patients can fill their prescriptions for these same drugs at the same pharmacies at the same price whether or not covered entities engage in the accounting fiction espoused by retroactive pricing models.

8.      Covered entities have no obligation to pass on 340B savings to their patients, and they generally do not.  Instead, they bill insurers and government payors for the full price of the drug and pocket the difference.  The purported "patients" often do not know they have "participated" in the program at all.  In short:  The only beneficiaries of contract pharmacy arrangements are covered entities, contract pharmacies, and the third-party administrators who service them.  Patients get the same drugs at the same prices at the same locations, whether or not their pharmacy is deemed a contract pharmacy or their transaction is at some point deemed a 340B-eligible sale.

9.      Contract pharmacies have fueled the 340B Program's breakneck growth—most of which has occurred outside the boundaries Congress drew for the program.  That is because contract pharmacies create the kind of pricing opacity that allows program misuse to thrive, with predictable results:  The 340B Program has been beset by fraud, waste, and abuse, as the federal government and many private analysts have repeatedly found.

10.      With that as backdrop, both the D.C. Circuit and the Third Circuit have recognized that the federal 340B statute gives manufacturers power to place reasonable conditions on contract pharmacy arrangements in order to rein in this abuse.  *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023).  In particular, the D.C. Circuit expressly held that federal law does not require manufacturers to recognize an unlimited number of contract pharmacy arrangements in order to comply with federal law.  *Novartis*, 102 F.4th at 459.

11.      In light of that ruling, Novartis began limiting contract pharmacy arrangements to something closer to their historical role in the 340B Program.  Novartis also took steps to increase program transparency and accountability.  Corporate beneficiaries of unlimited contract pharmacy

arrangements—contract pharmacies and other middlemen, but emphatically not patients—have fought back by trying to come up with creative ways to try to keep the 340B spigot overflowing.

12.     Enter Chapter 103.  The new Maine law purports to force manufacturers to do what the federal courts found Congress intentionally gave manufacturers power not to do: recognize unlimited contract pharmacy arrangements, with the dramatic expansion of 340B pricing that entails.  Chapter 103 would turn federalism on its head; states cannot override Congress's policy choices—especially in a closed system like 340B.

13.     Chapter 103 is a state drug-pricing statute.  It requires manufacturers to recognize unlimited contract pharmacy arrangements—greatly expanding the amount of 340B discounts manufacturers must provide in Maine beyond what federal law requires.  To recognize a contract pharmacy is to give the covered entity power to sweep ordinary drug sales that would otherwise occur outside the 340B Program into the program's ambit.  And this is solely an issue of price, not delivery.  The exact same drugs at issue are already being delivered to the same pharmacies, and the same sales to customers at the same prices would occur regardless of Chapter 103.  The only thing that distinguishes a "340B" drug from a non-"340B" drug under Chapter 103 is the discount a covered entity—not a patient—claims on it after it is dispensed.

14.     Chapter 103 also contains its own enforcement scheme—and it authorizes potentially drastic sanctions.  In this way, Chapter 103 replaces Congress's "unitary" design with a fractal set of overlapping and potentially contradictory adjudications.  That directly contravenes the Supreme Court's holding that enforcement of the 340B statute rests with the federal government alone.  *Astra*, 563 U.S. at 119–120.  Both the significant expansion of penalties and the decentralized nature of the enforcement scheme improperly override the plain language of the 340B statute, congressional intent, and binding Supreme Court authority.

15.     None of this is how Congress intended the 340B Program to work.  The 340B Program is a paradigmatically federal field, and Congress intended exclusively federal governance.

16.     The overwhelmingly federal nature of this subject is apparent from the face of Chapter 103.  It is impossible to explain what Chapter 103 does without explaining the federal 340B Program first; Chapter 103 defines what it means by a "340B entity" or a "340B" drug by cross-referencing the 340B statute, leaving the reader to consult federal law to make sense of its state-law mandates.  Yet states are not free to tinker with federal requirements as they see fit.

17.     Chapter 103 also is preempted under conflict-preemption principles because it frustrates the objectives of the federal program.  The Maine law attempts to refashion the 340B Program by dictating who can participate, on what terms they can participate, and the consequences of noncompliance.  Carried to its logical conclusion, that effort would transform the federal 340B Program into 56 separate drug-pricing programs—one for each state, inhabited territory, and the District of Columbia.

18.     Chapter 103 also violates the dormant Commerce Clause.  The state law reaches beyond Maine's borders by capping the prices that out-of-state manufacturers can charge their out-of-state wholesalers.  It discriminates against non-Maine economic interests by forcing the out-of-state pharmaceutical industry to subsidize in-state hospitals and pharmacies.  And it burdens interstate commerce by subjecting manufacturers to a patchwork of fractalized state regulation—all without providing any legitimate local benefit.

19.     Absent immediate judicial intervention enjoining Chapter 103, Novartis will suffer irreparable harm.  Once the law takes effect on **September 24, 2025**, Novartis will risk violating Maine law—and incurring serious penalties—merely by maintaining a 340B policy with reasonable guardrails that have already been declared lawful by federal courts applying the 340B

statute.  If Chapter 103 is not enjoined, that irreparable harm will include an ongoing loss of Novartis's constitutional rights and unrecoverable administrative costs as Novartis scrambles to navigate a motley, continuously shifting regulatory landscape.  Novartis therefore requests a preliminary injunction enjoining enforcement of Chapter 103.

## PARTIES

20.    Plaintiff Novartis Pharmaceuticals Corporation is a corporation organized in Delaware with its principal place of business at 59 Route 10, East Hanover, New Jersey 07936. Novartis's mission is to reimagine medicine to improve and extend people's lives.

21.    Defendant Aaron M. Frey is the Attorney General of Maine.  He is responsible for administering and enforcing Chapter 103.  Defendant Frey maintains an office at 6 State House Station, Augusta, ME 04333.  He is sued in his official capacity only.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction under 28 U.S.C. § 1331, because this civil action arises under the laws of the United States, and under 28 U.S.C. §§ 2201–02, because this is an actual, justiciable controversy as to which Novartis requires a declaration of its rights by this Court and injunctive relief to prohibit Defendant from violating the U.S. Constitution.

23.    This Court also has inherent equitable power to enjoin the actions of state officials that violate the U.S. Constitution and federal law.  *Ex parte Young*, 209 U.S. 123, 159–160 (1908); *Town of Barnstable v. O'Connor*, 786 F.3d 130, 138 (1st Cir. 2015).

24.    Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and (2) because Defendant resides in this district and because a substantial part of the events giving rise to Novartis's claims occurred in this district.  The challenged state law also purports to govern contract pharmacy arrangements in this district.

## FACTUAL BACKGROUND

### I.    Statutory and Regulatory Background

**The 340B Program**

25.    When Congress created the Medicaid Drug Rebate Program, it based manufacturers' discounting obligations on the "best price" given to any purchaser.  H.R. Rep. No. 102-384(II), *9–10 (1992).  This design inadvertently disincentivized drug manufacturers from voluntarily offering reduced prices to the Department of Veterans Affairs and to charitable hospitals (as they had previously been doing).  *Id.*; Milt Freudenheim, *Big Costs Imposed on Drug Makers*, N.Y. Times (Nov. 6, 1990) at D2, https://tinyurl.com/368umt5y.  Congress enacted the 340B Program in 1992 to undo that disincentive.  H.R. Rep. No. 102-384(II), *12 (1992); Pub. L. No. 102-585, § 602(a), 106 Stat. 4943, 4967 (1992).

26.    Federal law defines a covered entity precisely.  The statute lists fifteen types of healthcare providers that can be covered entities.  42 U.S.C. § 256b(a)(4).  When Congress created the program, only about 1,000 covered entities could receive the heavily reduced 340B ceiling prices.[1]  The statute's enumeration of covered entities continues to reflect the program's narrow purpose: to support specific types of hospitals that serve under-resourced patients.  *Id.*; *see also, e.g.*, 42 U.S.C. § 256b(a)(4) (listing AIDS drug purchasing assistance programs, hemophilia diagnostic treatment centers, black-lung clinics, and Native Hawaiian Health Centers, among others).

27.    The 340B Program therefore serves a specific, deliberately balanced federal purpose: to regulate drug prices in a narrow category of purchases to a narrow and specified list of

---

[1]  Ryan P. Knox et al., *Outcomes of the 340B Drug Pricing Program*, 4(11):e233716 JAMA Health F., at 4 (Nov. 2023), https://tinyurl.com/mwrfzwym.

entities.  Manufacturers must offer covered outpatient drugs to providers called "covered entities" at a deeply reduced price, known as the "ceiling price."  42 U.S.C. §§ 256b(a)(1), (a)(4), (b)(1).

28.    Federal law prescribes a statutory formula for calculating 340B ceiling prices.  42 U.S.C. § 256b(a)(2); 42 C.F.R. § 10.10(a).  Ceiling prices can drop as low as a penny per drug. 340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation, 82 Fed. Reg. 1,210, 1,215 (Jan. 5, 2017).  Covered entities, however, have no obligation to pass those savings on to patients,[2] and they mostly do not.[3]

29.    All of this comes at a great cost to manufacturers.  The statute therefore includes a number of protections to avoid abuse and limit the burden on drugmakers.  Most fundamentally, manufacturers need not offer 340B prices to anyone other than a covered entity.  42 U.S.C. § 256b(a)(1).

30.    In addition, a covered entity must meet three statutory requirements to qualify for a 340B discount.  First, covered entities may not "duplicate" discounts by requesting 340B prices on drugs that will also be subject to a Medicaid rebate.  See 42 U.S.C. § 256b(a)(5)(A).  Second, covered entities cannot "divert" a 340B product by dispensing it to anyone besides a "patient" of the covered entity.  Id. § 256b(a)(5)(B).  These limitations reflect Congress's awareness of the dangerous arbitrage incentives created by the 340B Program:  Covered entities can sell discounted drugs for much more to customers and payors, including Medicare and Medicaid.  These anti-duplication and anti-diversion provisions are intended to ensure that 340B pricing hews to its purpose.  Third, covered entities must permit manufacturers to audit records that "directly pertain

---

[2]  Rena M. Conti & Peter B. Bach, *Cost Consequences of the 340B Drug Discount Program*, 309 JAMA 1995, 1995 (2013), https://tinyurl.com/yc2t8b35.

[3]  Rory Martin & Kepler Illich, IQVIA, *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?* 11–12 (2022), https://tinyurl.com/4bfbz7yz.

9

to the entity's compliance" with the anti-duplication and anti-diversion prohibitions.  *Id.* § 256b(a)(5)(C).  This audit requirement is intended to give teeth to the first two compliance requirements and to ensure that covered entities are receiving 340B discounts only for eligible transactions.  *Id.* § 256b(a)(5)(C).

**Federal Enforcement Mechanisms**

31.    The federal 340B statute provides for two enforcement mechanisms.  The federal government can levy civil monetary penalties on manufacturers that knowingly and intentionally charge covered entities more than the ceiling price for drugs dispensed to 340B patients.  42 U.S.C. § 256b(d)(1)(B)(vi)(III).  Manufacturers face liability of up to $7,034 "for *each instance* of overcharging a covered entity that may have occurred."  *Id.* (emphasis added); *see also* Annual Civil Monetary Penalties Inflation Adjustment, 89 Fed. Reg. 64,815, 64,819 (Aug. 8, 2024) (adjusting the statutory amount for inflation).  Each "order" that ultimately "results in a covered entity paying more than the ceiling price" is an "instance of overcharging."  42 C.F.R. § 10.11(b).

32.    Federal law also provides for an administrative dispute resolution (ADR) process, in which both covered entities and manufacturers have a pathway to enforce 340B Program compliance.  42 U.S.C. § 256b(d)(3).  HHS has promulgated detailed ADR regulations.  340B Drug Pricing Program, 89 Fed. Reg. 28,643 (Apr. 19, 2024); 42 C.F.R. § 10.20 *et seq.*  Under those regulations, a covered entity may bring an ADR claim against a manufacturer alleging that the "manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price."  42 C.F.R. § 10.21(a)(1).  HHS's procedural regulations include a three-year statute of limitations, *id.* § 10.21(b)(1), joinder rules, *id.* § 10.21(c), timelines for responses, § 10.21(e), covered entities' ability to request discovery from manufacturers, *id.* § 10.22, and a mechanism for appealing adverse decisions to the HRSA Administrator, *id.* § 10.24.

A final decision by the HRSA Administrator constitutes final agency action reviewable in federal court under the Administrative Procedure Act. *See id.* § 10.24(e); 5 U.S.C. § 704.

33. Manufacturers' ability to bring an ADR proceeding depends on their ability to get timely information about covered entities' transactions. Federal law prevents a manufacturer from initiating ADR proceedings against a covered entity unless it has first audited that entity. 42 U.S.C. § 256b(d)(3)(B)(iv). And by regulation, HRSA requires manufacturers to first show "reasonable cause" to initiate an audit by first adducing "sufficient facts and evidence in support" of a claim that a covered entity has misused the 340B Program. Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996) (Audit Guidelines). A manufacturer therefore cannot begin an audit—or, by extension, ADR proceedings—unless it first has enough data to substantiate concerns about a covered entity's transactions.

**Contract Pharmacy Arrangements**

34. At the 340B Program's inception, covered entities dispensed 340B-priced drugs only through in-house pharmacies. That is consistent with the 340B statute, which "suggests that [Congress] had in mind one-to-one transactions between a covered entity and a drug maker." *Sanofi*, 58 F.4th at 704.

35. Covered entities lacking an in-house pharmacy eventually sought the ability to contract with an outside pharmacy in order to claim access to 340B discounts. In 1996, HRSA finalized guidance for the purpose of permitting each covered entity lacking an *in-house* pharmacy to contract with one *outside* pharmacy, so long as the pharmacy agreed to abide federal compliance standards. Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996).

36.    At first, covered entities and their contract pharmacies mostly used a physical-inventory model.  That is, a covered entity or its contract pharmacy physically segregated units purchased at 340B prices from units purchased at commercial prices.  Each entity then determined whether a prescription was 340B-eligible before dispensing a drug.[4]  If the prescription was 340B-eligible, the covered entity dispensed a 340B-priced unit.  Otherwise, it dispensed a commercially priced unit.

37.    Over time, covered entities have shifted toward retroactive methods of claiming 340B pricing, including the replenishment model.  These retroactive pricing models are now the dominant methods of offering 340B pricing in Maine (and nationwide).

38.    The replenishment model works like this:

    a.    The pharmacy purchases, at commercial prices, a pre-set amount of a drug. The pharmacy places the drug in common inventory—that is, the pharmacy maintains no distinction between "340B" drugs and other drugs.

    b.    Over time, the pharmacy dispenses drugs from common inventory when-ever a customer arrives at the pharmacy counter with a prescription.  The pharmacy does so without regard to whether the customer is a patient of the covered entity or whether the prescription is 340B-eligible.

    c.    A third-party administrator gathers claims data from both covered entities and contract pharmacies to analyze prior dispenses to assess which of them it thinks *could* have been 340B-eligible.  That call is made through an opaque algorithm that drug manufacturers never see.  And the third-party

---

[4]  *See* HHS OIG, *Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431 at 5 (Feb. 4, 2014) (Contract Pharmacy Report), https://tinyurl.com/2nmdrcey.

administrator is incentivized to "find" 340B eligibility as often as possible because it (like contract pharmacies) gets paid based on the number of "matches" it reports.

d.    When the third-party administrator purports to identify enough 340B-eligible transactions, the covered entity (or sometimes the contract pharmacy or third-party administrator) orders "replenishment" units of the drug at the 340B price.

e.    The pharmacy places the replenishment drug purchased at the 340B price in its common inventory, to be dispensed to the next customer who walks in the door (whether a patient of the covered entity or not, and whether eligible to receive a 340B drug or not).  And the cycle begins all over again.

39.    In short, the replenishment model—like all retroactive pricing models—is based on an accounting trick.  The upshot is that 340B drugs are dispensed without regard to 340B eligibility.  A unit may receive 340B pricing based on the identification of a previously dispensed drug—often one dispensed long ago—as ostensibly 340B-eligible.  But a pharmacy that receives 340B-priced drugs does not treat that inventory as belonging to the 340B Program, and it acquires the same drugs at commercial prices irrespective of the 340B Program.  As a logical outgrowth of retroactive pricing models, drugs purchased at 340B prices are not necessarily dispensed to patients of covered entities, nor does a covered entity necessarily maintain title to them.[5]  Pharmacy

---

[5] *E.g.*, 340B Contract Pharmacy Services Agreement – ReCept Pharmacy at 5, § 3.2 (Dallas Cnty. Comm'rs Ct.) ("County shall purchase 340B Drugs through a written contract with the Supplier and shall hold title to such drugs from the time the Supplier fills the order from ReCept [(the contract pharmacy)] made on behalf of the County until the time that ReCept takes delivery of the drugs."), https://bit.ly/4gDGvbq; *see also* Pharmacy Services Agreement Between the County of Monterey and CVS Pharmacy, Inc. at 9, https://bit.ly/3Dhg9xo.

customers, for their part, almost always pay whatever price their insurance ordinarily requires, without regard to whether their prescription was the trigger for 340B eligibility. The replenishment model treats 340B status like a virtual baton that is passed from unit to unit, depending on whatever narrative suits covered entities' needs at a given moment. In this world, there is no such thing as a singular "340B drug" for all purposes.

40.    Contract pharmacies and third-party administrators have a strong incentive to report transactions as being supposedly 340B-eligible. Each middleman gets a cut of the 340B funds, which shapes how the program plays out in practice: As the U.S. Court of Appeals for the D.C. Circuit has correctly noted, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457–458.

41.    The incentives underlying retroactive pricing models and unlimited contract pharmacy arrangements have made big business out of purporting to identify 340B-eligible transactions. A handful of massive for-profit pharmacy chains and pharmacy benefit managers now dominates the contract pharmacy industry.[6] Third parties siphon much of the money Congress intended to help non-profit hospitals located in underserved communities: About 16 percent of *all* 340B "revenue" currently fills the coffers of these for-profit third parties.[7] That share is so large that some covered entities reported a "net loss" on 340B transactions "as a result of their high

---

[6]  Adam Fein, *EXCLUSIVE: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market*, Drug Channels (July 11, 2023), https://tinyurl.com/5n6hfmtd.

[7]  Minnesota Dep't of Health, *340B Covered Entity Report* 9 (Nov. 25, 2024), https://www.health.state.mn.us/data/340b/docs/2024report.pdf.

14

external operational costs." *Id.* at 25.  Meanwhile, Walgreens and CVS warn investors that changes to contract pharmacy arrangements would materially hurt their bottom lines.[8]

42.    The intermediaries' work occurs largely in secret.  Under retroactive pricing models, covered entities typically do not tell manufacturers which specific transactions they have identified as 340B-eligible or why—either before or after demanding 340B pricing for a past purchase.  In other words, the covered entities and their cohorts are demanding that manufacturers offer massive discounts without providing even the most basic documentation showing the sale's eligibility for this discount.  No legitimate business would or could operate in this manner.

43.    As a result, "[t]ransparency in the 340B Program is being compromised . . . by a lack of publicly available data, including" data showing "which claims are 340B-eligible."  Martin & Illich, *supra* n.3, at 12.  Even "patients are often unaware that they have participated in the 340B Program at all."[9]

**Runaway Growth and Compliance Problems**

44.    The predictable result of all this clandestine profit-seeking has been accelerating growth of the 340B Program, driven largely by misuse.

45.    In 2010, HRSA began allowing covered entities to use unlimited contract pharmacies.  Total 340B spending was then about $6.6 billion.[10]  That volume multiplied *tenfold*

---

[8]  CVS Health, *2024 Annual Report* 23 (Feb. 12, 2025) ("A reduction in Covered Entities' partic-ipation in contract pharmacy arrangements . . . could materially and adversely affect the Com-pany."), https://tinyurl.com/2s396dp2; Walgreens Boots Alliance, *2024 Annual Report* 35 (Oct. 15, 2024) (similar), https://tinyurl.com/32nssxjm.

[9]  Neal Masia, Alliance for Integrity & Reform, *340B Drug Pricing Program: Analysis Reveals $40 Billion in Profits in 2019* 2, https://tinyurl.com/7cc3dw2t.

[10]  Rebecca Sachs & Joshua Varcie, Congressional Budget Off., *Spending in the 340B Drug Pricing Program, 2010 to 2021* 2 (June 17, 2024) (CBO Report), https://tinyurl.com/ykt2d4v9.

by 2023, reaching \$66.3 billion.[11]  In just the last five years of available data, 340B volume grew by *over 129 percent*.[12]  The 340B Program is now the second-largest federal drug-pricing program, behind only Medicare Part D (and not by much).[13]  It is larger than Medicaid and Medicare Part B—even though access to those programs is supposed to be the incentive for manufacturers to participate in the 340B Program.  *See* 42 U.S.C. §§ 1396r-8(a)(1), (5)(A).  Thus, the explosive growth in the program began—and rapidly accelerated—only recently.

46.    That growth in the 340B Program was largely driven by the explosion of contract pharmacy arrangements.  The federal Government Accountability Office (GAO) reports that only about 1,300 such relationships existed in 2010.  GAO, *340B Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement*, GAO-20-212 at 2 (Jan. 2020) (GAO 2020 Report), https://www.gao.gov/assets/gao-20-212.pdf.  The same number is now about 35,000.[14]

47.    The explosion of contract pharmacy arrangements has created serious federal compliance concerns, as federal agencies have repeatedly recognized.  For example, GAO has tied the increase in contract pharmacy arrangements to increased "potential for duplicate discounts." *See* GAO 2020 Report, *supra* ¶ 46, at 2; *see also id.* at 32–33 (noting that dispenses at contract pharmacies often do not produce data that allows stakeholders "to detect potential duplicate

[11]  Adam Fein, *The 340B Program Reached \$66 Billion in 2023—Up 23% vs. 2022*, Drug Channels (Oct. 22, 2024), https://tinyurl.com/mryxdh34.

[12]  Rory Martin & Harish Karne, IQVIA, *The 340B Drug Discount Program Grew to \$124B in 2023* (May 31, 2024), https://tinyurl.com/3b8zcu5a.

[13]  Ashley Flint et al., *340B Purchase Data Highlights Continued Program Growth*, Avalere Health (Oct. 24, 2024), https://tinyurl.com/yzwt66mf.

[14]  Milena Sullivan et al., *Contract Pharmacy Trends May Help Inform 340B Reform Debate*, Avalere Health (June 10, 2024), https://tinyurl.com/3umyyrvc.

discounts"). HHS OIG, too, found that the proliferation of contract pharmacies "create[s] complications in preventing" both unlawful "diversion" and "duplicate discounts." Contract Pharmacy Report, *supra* n.4, at 1–2.

48.    To see why, consider that "contract pharmacies are more likely" than in-house covered-entity pharmacies "to serve both patients of covered entities and others in the community." GAO, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement*, GAO-11-836 at 28 (Sept. 2011), https://www.gao.gov/assets/d11836.pdf. When that fact is combined with the opacity and retroactive nature of the replenishment model, it results in ample opportunities to claim 340B pricing inappropriately. The D.C. Circuit has noted a helpful example: "[S]uppose a physician practices at a covered entity and somewhere else. The physician writes a prescription for a patient of his private practice. Yet the contract pharmacy, connecting the physician to the covered entity, classifies the prescription as eligible for the discount." *Novartis*, 102 F.4th at 458.

49.    Under those circumstances, 340B noncompliance has become routine. In just one seven-year span, HHS audits found over 1,500 instances of 340B Program noncompliance, including 429 instances of duplication. GAO, *HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements*, GAO-21-107 at 14 (Dec. 2020), https://www.gao.gov/assets/gao-21-107.pdf. Given the low volume of government audits,[15] those findings suggest huge rates of noncompliance. The available evidence confirms as much: In 2021, "[m]ore than 60

---

[15] HHS audits only about 200 covered entities per year. Decl. of Krista M. Pedley, *Sanofi-Aventis U.S., LLC v. HHS*, No. 3:21-CV-634 (D.N.J. July 6, 2021), ECF No. 93-2 ¶ 6. HHS also does not audit for duplication in Medicaid managed care, which accounts for the majority of Medicaid utilization. GAO, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, GAO-18-480 at 25 (June 2018), https://tinyurl.com/5n6ts92a.

percent of audited covered entities had at least one adverse finding."[16]  In short, 340B "discount errors" have become "likely" and "duplicate discounts" are now "quite common."[17]

50.    Unlawful duplication, in particular, has become staggering.  Some analysts estimate that three to five percent of *all* Medicaid rebates now duplicate 340B pricing.[18]  In 2020 alone, that rate amounted to between *$1.3 billion and $2.1 billion* in illegal duplicates.  *Id.*  The amount of duplication is likely much higher today because 340B purchases nearly doubled between 2020 and 2023, rising from $38 billion to $66 billion.  *See* Fein, *supra* n.6.

51.    The Congressional Budget Office recently found that "[t]wenty percent of the growth in 340B spending from 2010 to 2021 can be attributed to spending on drugs dispensed at contract pharmacies."  CBO Report, *supra* n.10, at 8.  More contract pharmacies, or fewer restrictions on contract pharmacies, means more opportunities for self-interested middlemen to "influence which prescriptions are classified as 340B."[19]  That is, after all, why many covered entities partner with for-profit third parties in the first place—they "show[ ] hospitals how to . . . boost[ ] the number of prescriptions that can qualify for discounts."  *See, e.g.*, Ellen Gabler, *How a Company Makes Millions off a Hospital Program Meant to Help the Poor*, N.Y. Times (Jan. 16, 2025), https://tinyurl.com/yv7akn6t.

---

[16]  Lindsay Bealor Greenleaf, *Analysis of FY 2021 HRSA 340B Covered Entity Audits*, ADVI (Feb. 23, 2023), https://tinyurl.com/yc2aktnh.

[17]  House Energy & Com. Comm*., Review of the 340B Drug Pricing Program* 36 (Jan. 10, 2018) (340B House Report), https://tinyurl.com/58rpjkfv.

[18]  Ashwin Mundra, *The 340B Noncompliance Data Gap Leaves Drug Manufacturers in the Dark*, Drug Channels (Mar. 18, 2022),  https://tinyurl.com/2ewmceba.

[19]  *See* Aaron Vandervelde et al., Berkely Rsch. Grp., *For-Profit Pharmacy Participation in the 340B Program* 8 (Oct. 2020), https://tinyurl.com/mrxxr4rn.

52.     Hospitals are particularly adept at exploiting 340B pricing spreads.  One recent study found that "[h]ospitals eligible for 340B discounts obtained reimbursement-price markups that were 6.59 times . . . as high as those obtained by physician practices."[20]   More contract pharmacy arrangements therefore means more money in the pockets of hospitals, third-party pharmacies, and third-party administrators.  Most patients get nothing.  Worse, some evidence shows "that the ability of people suffering severe economic hardship to afford needed drugs and medical care, relative to the general population, is *negatively correlated* with growth in the 340B Program."[21]

53.     After a detailed investigation into how the 340B Program works on the ground, a Senate committee recently concluded that the covered entities it studied "do not pass 340B discounts directly to their patients," and that in recent years manufacturers "have seen significant increases in 340B sales to contract pharmacies compared to direct sales to hospitals and grantees." The investigation necessarily focused on select covered entities, federal grantees, and drug manufacturers, but its "findings reveal insights into how 340B revenue flows among the largest 340B participants, and how they use this revenue on behalf of patients."[22]   Those insights culminated in the finding that "transparency and oversight concerns . . . prevent 340B discounts from translating to better access or lower costs for patients."  Senate HELP Committee Report, *supra* n.22, at 38.

---

[20]   James C. Robinson et al., *Hospital Prices for Physician-Administered Drugs for Patients with Private Insurance*, 390 New Engl. J. of Med. 338, 344 (2024), https://tinyurl.com/33zvwnex.

[21]   Bruce Levinson, *Measuring the Effectiveness of the 340B Program* 3–9 (Nov. 1, 2018) (emphasis added), https://tinyurl.com/3fnsr4nv.

[22]   Senate Health, Education, Labor & Pensions Comm., *Congress Must Act to Needed Reforms to the 340B Drug Pricing Reform* 5, 9, 32 (Apr. 2025) (Senate HELP Committee Report), https://tinyurl.com/bdd24yd4.

54.    For all those reasons, contract pharmacy arrangements have nothing whatsoever to do with giving patients access to drugs, or even to discounted prices on drugs.  They exist solely to benefit hospitals, pharmacies, and third-party administrators at drug manufacturers' expense.

## II.    Novartis's Contract Pharmacy Policies and Related Litigation

55.    Novartis became concerned about the seemingly endless growth of contract pharmacy arrangements and their abuses of the 340B Program that began after HRSA's 2010 guidance.  As that growth rapidly accelerated in recent years, Novartis implemented policies placing reasonable limitations on contract pharmacy arrangements, aiming to mitigate their harms and to restore contract pharmacies to the place they historically occupied in the 340B Program.

56.    Novartis implemented its first contract pharmacy policy in late 2020.  Under that policy, Novartis honored contract pharmacy arrangements only if the third-party pharmacy was within 40 miles of the covered entity.  But Novartis exempted federal grantees and permitted other covered entities to request exemptions if justified by a specific need.  Novartis also requested— but did not require—that covered entities give Novartis basic claims data.

57.    Covered entities complained to HRSA.  Letter from HRSA to Novartis at 1 (May 17, 2021), https://tinyurl.com/d34r9ajp.  HRSA initially took the position that Novartis's policy violated the federal 340B statute.  *Id.*  HRSA claimed that "[n]othing in the 340B statute grants a manufacturer the right to place conditions" on offers to provide drugs at 340B prices.  *Id.*  So HRSA threatened Novartis with civil monetary penalties and ordered Novartis to "plan to restart selling, without restriction, 340B covered outpatient drugs at the 340B price to covered entities with contract pharmacy arrangements."  *Id.* at 2.

58.    Novartis challenged HRSA's 2021 letter as inconsistent with the federal 340B statute.  *Novartis Pharms. Corp. v. Espinosa*, No. 1:21-CV-1479 (D.D.C. filed May 31, 2021).

The U.S. District Court for the District of Columbia set aside HRSA's letter. *Id.*, 2021 WL 5161783 (D.D.C. Nov. 5, 2021). It rejected HRSA's position that the federal 340B statute "prohibit[s] . . . manufacturers from imposing any conditions on their offers of 340B-priced drugs to covered entities." *Id.* at *9 (emphasis omitted).

59.    Novartis updated its contract pharmacy policy in 2023. Under that policy, Novartis would provide 340B-priced drugs directly to covered entities with an in-house pharmacy. Covered entities without an in-house pharmacy could select one contract pharmacy where Novartis would provide 340B pricing. Novartis also elected to continue recognizing contract pharmacy arrangements between covered entities and pharmacies wholly owned and controlled by those covered entities. Novartis again requested that covered entities provide claims data electronically.

60.    About a year later, the U.S. Court of Appeals for the D.C. Circuit affirmed the district court's decision setting aside HRSA's 2021 letter. *Novartis*, 102 F.4th 452. The D.C. Circuit observed that a contract pharmacy arrangement creates "a financial incentive to catalog as many prescriptions as possible as [340B-]eligible." *Id.* at 457–458. That is because it allows "[t]he covered entity, the pharmacy, and the third-party administrator [to] divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Id.* at 457.

61.    The D.C. Circuit "reject[ed] HRSA's position that section 340B prohibits drug manufacturers from imposing any conditions" on the use of contract pharmacies. *Novartis*, 102 F.4th at 459. HRSA had argued that the statute does not expressly tell manufacturers they may impose such conditions. But the D.C. Circuit concluded that Congress acted deliberately, and "this silence preserves—rather than abrogates"—manufacturers' discretion to impose reasonable conditions. *Id.* at 460. Among other problems, HRSA's contrary reading would have

"categorically requir[ed] manufacturers to deal with an unlimited number of contract pharmacies"—an obligation not found in the federal statute. *Id.* at 462.

62.    Despite referring to statutory "silence," the D.C. Circuit did not suggest that the federal 340B statute leaves manufacturers' ability to condition 340B pricing *unregulated*. Rather, the federal 340B statute requires manufacturers to "offer each covered entity covered outpatient drugs for purchase" at or below the "ceiling price." 42 U.S.C. § 256b(a)(1). That requirement prevents manufacturers from imposing conditions so onerous that they amount to a failure to make a "bona fide offer"—for example, if the conditions "effectively increase the contract 'price,' thus perhaps nudging it above the statutory ceiling." *Novartis*, 102 F.4th at 462. But within the range of bona fide offers, Congress affirmatively and intentionally granted "private parties" the right to "act freely" in agreeing to contractual terms. *See id.* at 460.

63.    The D.C. Circuit expressly held Novartis's updated contract pharmacy policy lawful. It reasoned that limiting covered entities to in-house pharmacies or to "a single contract pharmacy . . . neither precludes Novartis from making a bona fide 'offer' nor increases its contract 'price.' " *Novartis*, 102 F.4th at 463–464. That condition on 340B sales is "consistent with historic practices under the section 340B Program." *Id.* at 464. It is thus within the range permitted by the federal 340B statute. *See also Sanofi*, 58 F.4th at 703–706.

64.    Novartis further updated its contract pharmacy policy on January 1, 2025. Ex. 1 (2025 Policy). This policy differs from Novartis's 2023 policy in essentially three ways. First, contract pharmacies working for covered entities subject to the policy must provide basic claims data to receive 340B-priced drugs. These data include identification of the specific transaction for which the discount is claimed, the drug at issue, the pharmacy name, the covered entity name, and the prescriber name. This information is needed to "mitigate instances of duplicative discounts"

that violate federal law, and sharing it will "increase transparency" and "help maintain the integrity and sustainability" of the 340B Program.  Ex. 1 (2025 Policy) at 1.  Novartis's decision to require these data was influenced by the fact that covered entities mostly refused to provide such data voluntarily under Novartis's prior policies.  It also was driven by the D.C. Circuit's recognition that manufacturers could require claims data from covered entities under the 340B statute.

65.    Second, Novartis clarified that a designated contract pharmacy must be one that dispenses drugs to patients.  That is, covered entities cannot designate a "central fill" pharmacy— a pharmacy that distributes product to many retail pharmacy locations—in an attempt to circumvent Novartis's one-contract pharmacy condition on 340B pricing.

66.    Third, contract pharmacies wholly owned and controlled by a covered entity are no longer exempted from the policy.  Novartis will not recognize arrangements between covered entities and these pharmacies unless a covered entity lacks an in-house pharmacy and designates an outside pharmacy as its single permitted contract pharmacy.  Federal grantees, however, continue to be exempted.

## III.    Maine Enacts Its Own "340B" Legislation

67.    The Maine Legislature recently passed Chapter 103, explicitly creating new state-level "340B" obligations.  Maine State Legislature, H.P. 132 – L.D. 2010 Part P (June 20, 2025), https://tinyurl.com/47syb59t.  This state law does not try to conceal its federal subject matter. Chapter 103 defines its key terms solely by reference to "Section 340B of the federal Public Health Service Act, 42 United States Code, Section 256b."  24-A M.R.S. § 7752(5)–(7).

68.    The sponsor of the bill that ultimately became Chapter 103 acknowledged the federal nature of the state law.  She told the committee that approved the bill:  "[W]e are dealing with a federal program, and we have very little room to navigate.  In other words, the 340B drug

discount program is not ours to re-shape as we see fit."  Testimony of Sen. Donna Bailey Before the Joint Standing Comm. on Health Coverage, Ins. & Fin. Servs. at 2 (Apr. 16, 2025) (Sen. Bailey Testimony), https://tinyurl.com/hfbeczya.  Yet re-shape the program it did.  And these new state-level 340B changes are set to take effect on September 24, 2025.  *See* Me. Const. art. IV, § 16.

**Pricing Regulations**

69.     Chapter 103 regulates drug pricing.  It does so by forbidding manufacturers to "directly or indirectly" "deny, restrict, prohibit, or otherwise interfere with" "the acquisition of a *340B drug* by, or delivery of a *340B drug* to, a 340B contract pharmacy on behalf of a 340B entity."  24-A M.R.S. § 7753(1) (emphases added).  The statute separately defines a "340B drug" as any drug "purchased or eligible for purchase under Section 340B of the federal Public Health Service Act, 42 [U.S.C. § 256b(a)(3)]."  *Id.* § 7752(6).  And a "340B entity," Chapter 103 announces, is any entity "participating or authorized to participate in the federal 340B drug discount program, as described in [42 U.S.C. § 256b]" *plus* contract pharmacies themselves (a type of entity not found in the federal 340B statute).  *Id.* § 7752(7).  In sum, the statute orders manufacturers to honor essentially all requests for 340B pricing for drugs sent to contract pharmacies.

70.     In practice, the law mandates a carte-blanche approach to retroactive pricing models.  Notwithstanding Chapter 103's nomenclature, under the federal statute there is no such thing as a "340B drug" and a "non-340B drug."  There are only "covered outpatient drugs," which—when sold to covered entities under the terms of the federal 340B statute—are subject to discounted pricing under federal law.  42 U.S.C. § 256b(a)(1).  When the state statute references a "340B drug," it is talking about a unit of drug sold at the 340B discounted price.

71.     These same drugs are also being sold to the same pharmacies (including contract pharmacies) at commercial prices.  Recall that under retroactive pricing models, contract pharmacy

arrangements are based on an accounting fiction. Pharmacies do not try to identify 340B-eligible drugs until long after a drug has been dispensed. A third-party administrator culls through data after the fact and tries to match up dispenses to pharmacy customers with covered entities' patients. Approaches vary on what happens when a match is purportedly found—for example, the replenishment model explained above—but these details are less important than the retroactivity itself. Thus, the state law does not affect patient access or the prices patients pay; those will remain unchanged under these models even if Chapter 103 were to take effect.

72.    Under the replenishment model, it isn't even clear which drug the covered entity would argue is the "340B drug"—the one that was purchased at commercial prices and dispensed by the pharmacy to a person who was purportedly a patient of a covered entity, or the "replenishment drug" that ultimately is purchased at the 340B discount and that may be dispensed to a non-340B patient. Covered entities and contract pharmacies do not seem to care. Their goal is simply for those entities to claim the 340B discount on as many transactions as possible.

73.    That is what Chapter 103 attempts to mandate, in spite of how multiple federal courts have interpreted federal law. By forcing manufacturers to recognize unlimited contract pharmacy arrangements, Chapter 103 expands the transactions triggering the 340B discount, drastically increasing the burdens of 340B participation—and, by extension, the entry price of Medicaid and Medicare Part B. Chapter 103 aims to force manufacturers to comply with the federal 340B Program on Maine's terms, using other federal drug-pricing programs as leverage.

**Restrictions on Data Collection**

74.    Chapter 103 also purports to make it unlawful for a manufacturer to "directly or indirectly" "require a 340B entity to submit any claims or utilization data as a condition" of receiving 340B pricing. 24-A M.R.S. § 7753(2). In other words, Novartis may not "require that

all non-grantee covered entities upload their claims data" to an electronic platform. Ex. 1 (2025 Policy) at 1.

75.     The Maine law purports to exempt "claims or utilization data sharing [that] is *required* by the United States Department of Health and Human Services." 24-A M.R.S. § 7753(2) (emphasis added). But this narrow carve-out does not include data that federal law authorizes, or even encourages, manufacturers to obtain.

**Enforcement Mechanisms**

76.     Manufacturers that violate Chapter 103's sweeping provisions are subject to severe penalties. Each violation may be punished with "any of the remedies" available under the Maine Unfair Trade Practices Act. 24-A M.R.S. § 7757(1). "A violation is committed each time a prohibited act . . . occurs." *Id.*

77.     Each violation of Chapter 103 deemed "intentional" and "unfair or deceptive" triggers "a civil penalty of not more than $10,000." 5 M.R.S. § 209. The Attorney General can also sue manufacturers "to restrain" alleged violations of Chapter 103 "by temporary or permanent injunction." 5 M.R.S. § 209. If a manufacturer is deemed to have violated such an order, it must pay a civil penalty of up to "$10,000 for each violation." *Id.* Further remedies are also on the table "as may be necessary to restore to any persons who have suffered any ascertainable loss by reason of such conduct found to be in violation." *Id.* These penalties could stack up quickly.

## CHAPTER 103 VIOLATES THE SUPREMACY CLAUSE

78.     "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme law of the land . . . anything in the . . . laws of any State to the contrary notwithstanding.' " *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting U.S. Const. art. VI, cl. 2).

79.     As the Supreme Court has noted, Congress created the 340B Program as an exclusively federal program.  It "placed the Secretary [of HHS] (acting through her designate, HRSA) in control of § 340B's drug-price prescriptions."  *Astra*, 563 U.S. at 114.  If other entities were to gain power over these requirements, "[t]hat control could not be maintained."  *Id.*  But that is precisely what Chapter 103 has attempted to do: wrest control over drug pricing from federal hands and give it instead to Maine regulators.

80.     The Supremacy Clause forbids that result, under both field- and conflict-preemption principles.  Chapter 103 is misguided from the start because the 340B Program is a pervasive regulatory scheme that states may not supplement or alter.  In addition, Chapter 103 impermissibly throws up several independent obstacles to accomplishing the purposes of the 340B statute and other federal statutes.

**Federal Law Occupies the Field.**

81.     Congressional "intent to displace state law" can be inferred from a regulatory scheme "so pervasive . . . that Congress left no room for the States to supplement it" or from a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."  *Arizona*, 567 U.S. at 399 (quotation omitted).

82.     The first step in a field-preemption analysis is to "define the field" that the state law implicates.  *Ouellette v. Mills*, 91 F. Supp. 3d 1, 8 (D. Me. 2015); *see also, e.g.*, *French v. Pan Am Exp., Inc.*, 869 F.2d 1, 3 (1st Cir. 1989) (identifying the field of "pilot qualification").  Chapter 103 is unusual because it does not identify any legislative field outside of federal legislation itself.  Nor could it.  On its face, Chapter 103 regulates activity under "the federal 340B drug discount program," 24-A M.R.S. § 7752(7), as defined by "Section 340B of the federal Public Health

Service Act," *id.* § 7752(6).  The "field" Chapter 103 regulates *is* federal law—the contours of the obligation to provide discounted pricing under the federal 340B statute.

83.     Chapter 103 has no force or meaning outside of the federal 340B Program.  If Congress were to repeal the federal 340B statute, Chapter 103 would cease to have any effect.  *See* 24-A M.R.S. § 7752(6)–(7) (citing 42 U.S.C. § 256b).  Chapter 103, in other words, "is inherently federal in character" because it regulates relationships that "originate[ ] from, [are] governed by, and terminate[ ] according to federal law."  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

84.     The federal 340B statute sets up a pervasive and carefully integrated pricing scheme that interacts with other federal drug-pricing programs.  Congress determined the ceiling price that manufacturers may charge to covered entities and decided which entities are entitled to receive that benefit.  *See* 42 U.S.C. §§ 256b(a)(1), (a)(4), (b)(1).  Contract pharmacies are not among them. *See id.* § 256b(a)(4).

85.     Congress also balanced the pricing obligations it imposed on manufacturers with corresponding requirements on covered entities.  Covered entities may not exploit the program by diverting 340B-priced drugs to persons who are not "patients of the covered entity."  *Id.* § 256b(a)(5)(B).  And Congress directed that manufacturers should not have to provide 340B pricing that duplicates discounts it has separately required under the Medicaid Drug Rebate Program, *id.* § 256b(a)(5)(A)(i), or the Inflation Reduction Act of 2022 (IRA), *id.* § 1320f-2(d)(1).

86.     To protect both covered entities and manufacturers, Congress created particular enforcement mechanisms under federal power and oversight.  HRSA may directly enforce the federal statute by imposing civil monetary penalties.  42 U.S.C. § 256b(d)(1)(B)(vi); 42 C.F.R. § 1003.100 *et seq.*  HRSA also oversees factfinding and dispute-resolution processes initiated by

regulated parties.  *See id.*  §§ 256b(a)(5)(C)–(D) (providing for auditing of covered entities and sanctions for noncompliance); 256b(d)(3) (establishing an ADR process).

87.    These federal enforcement mechanisms are exclusive.  Congress gave HHS "authority to oversee compliance" to ensure that the 340B Program is administered on a "uniform, nationwide basis," and it declined to permit "auxiliary enforcement" outside of the program.  *Astra*, at 117, 120.  This "centralized control and uniformity of design" is a hallmark of field preemption because "local restrictions" inherently make it "impossible [to] attain[ ]".  *French*, 869 F.2d at 5.

88.    State-level tinkering is "inevitably in conflict" with that objective.  *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 447 (1st Cir. 2000).  For this reason, "broad enforcement power" in federal hands "preempts virtually all alternative mechanisms for remedying violations."  *See id.*  The alternative—"a patchwork of state laws"—"would create a crazyquilt effect" that is inimical to Congress's design.  *French*, 869 F.2d at 6.

**Chapter 103 Is Preempted Under Conflict Preemption Principles.**

89.    Chapter 103 also is preempted under conflict preemption principles.  One flavor of conflict preemption is obstacle preemption, which occurs where state law "interferes with the methods by which . . . federal statute[s] [were] designed to reach [their] goal[s]."  *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).  Put differently, "[s]tate law need not clash head on with a federal enactment in order to be preempted."  *Securities Indus. Ass'n v. Connolly*, 883 F.2d 1114, 1123 (1st Cir. 1989).  It is enough to be "at odds with the policy which infuses" federal law, or to "erode the goals" underlying Congress's scheme.  *Id.* at 1124.

90.    Chapter 103 is a quintessential drug-pricing statute—it purports to control the prices at which drugs delivered to contract pharmacies must be sold.  That Chapter 103 refers to "delivery" and "acquisition" does not change this fact; what matters is the requirement that

29

manufacturers deliver or allow acquisition of a "340B drug." *See* 24-A M.R.S. § 7753(1). The only attribute that distinguishes a "340B" drug from a non-"340B" drug is its price. *Pharmaceutical Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 455 (S.D. W. Va. 2024) (addressing a similar West Virginia statute and finding it likely preempted by federal law). Thus, Chapter 103 expressly demands that manufacturers offer discounts on products that are otherwise available at commercial prices.

91.    That Chapter 103 is a drug-pricing statute—and not one that regulates delivery—is also evident from the fact that Novartis already continuously delivers (through its wholesale distributors) the *same drugs* at issue to the *same pharmacies* impacted by Novartis's policy. Chapter 103 regulates *only* the price that Novartis can charge the covered entities for those drugs. Put differently, Maine regulators could assess whether a violation of Chapter 103 has occurred only by comparing the price Novartis charged for a drug with the federal 340B ceiling price.

92.    Chapter 103 conflicts with federal law because it requires manufacturers to provide 340B pricing where the federal statute does not. The federal 340B statute does not require manufacturers to provide 340B prices on drugs to an unlimited number of contract pharmacies. *Novartis*, 102 F.4th at 461; *Sanofi*, 58 F.4th at 703; *Novartis*, 2021 WL 5161783, at *7; *AstraZeneca Pharms. LP v. Becerra*, No. 21-CV-27, 543 F. Supp. 3d 47, 61 (D. Del. 2021). But Maine has explicitly added contract pharmacies to the federal 340B statute as a sixteenth type of covered entity that must be offered 340B prices. *See* 24-A M.R.S. § 7752(7) (defining a "pharmacy contracted with the participating entity" as a "340B entity"); *id.* § 7753(1) (requiring manufacturers to provide 340B-priced drugs for the benefit of "340B entit[ies]").

93.    Chapter 103's expansion of 340B pricing is preempted because it compels manufacturers to provide discounts even where federal law—as determined by multiple federal

courts—"was intended to free [manufacturers] from [this] compulsion." *Verizon New England, Inc. v. Maine Pub. Utilities Comm'n*, 509 F.3d 1, 9 (1st Cir. 2007); *see also Geier v. American Honda Motor Co.*, 529 U.S. 861, 881 (2000) (state law could not impose a duty not created by federal regulation); *Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 10 (1st Cir. 2022) ("It is difficult to envision a more perfect collision of purposes" than for state law to forbid what federal law authorizes."); *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 850 (1st Cir. 1988) (state law that imposes requirements different from federal law "in effect second-guesses the balance struck by Congress").

94.     Similarly, allowing Maine to determine whether particular drugs should be subject to 340B pricing would interfere with the method by which the federal statute was designed to reach its goals, because it recalibrates the benefits and burdens of participating in the 340B Program. *E.g.*, *Verizon New England*, 509 F.3d at 9 (noting impermissible overlap between a federal agency's pricing orders and state attempts at rate-setting); *Public Util. Dist. No. 1 v. IDACORP Inc.*, 379 F.3d 641, 650 (9th Cir. 2004) (state law preempted where a court was asked "to set a fair price" for electricity priced by a federal agency).

95.     Chapter 103 further warps the federal 340B scheme by creating state-specific enforcement pathways that conflict with the ones Congress put in place. Chapter 103 empowers the Maine Attorney General to enforce its modifications of the 340B Program by imposing stiff fines. *See* 24-A M.R.S. § 7757(1); 5 M.R.S. § 209. But any enforcement proceeding to impose such fines will implicate the question whether each particular prescription is indeed for a 340B drug—meaning whether the hospital qualifies as a covered entity, whether the pharmacy customer is a "patient" of the covered entity, and whether the diversion prohibition has been triggered.

Without addressing these issues, there would be no way of knowing whether a particular transaction involved a "340B drug." *See* 24-A M.R.S. § 7752(6)–(7).

96.     State enforcement of federal 340B obligations is inconsistent with federal law. Congress created penalties for non-compliance, but elected not to make them so draconian that it would disincentivize participation in Medicaid and Medicare Part B. Congress explained exactly how the requirement to offer covered entities drugs at 340B prices should be enforced: (1) HHS may impose—but only for *knowing and intentional* violations—"sanctions in the form of civil monetary penalties" in specified amounts according to processes defined by regulation.[23] Or (2) covered entities may bring ADR claims alleging overcharges for 340B-eligible drugs. 42 U.S.C. § 256b(d)(3)(A). The ADR procedures, too, are exhaustively defined by regulation. 340B Drug Pricing Program, 89 Fed. Reg. 28,643 (Apr. 19, 2024); 42 C.F.R. § 10.20 *et seq.*[24]

97.     When Congress expressly provides for methods of enforcing a statute, courts presume those methods are exclusive. *See, e.g.*, *Middlesex Cnty. Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981). And states do not have the power to enforce federal law unless Congress clearly provides otherwise. *See, e.g.*, *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263–264 (1972). The federal 340B statute contains no suggestion that Congress intended to do so here—let alone a clear statement. *See generally* 42 U.S.C. § 256b.

---

[23]  42 U.S.C. § 256b(d)(1)(B)(vi); 42 C.F.R. § 1003.100 *et seq.*; 340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation, 82 Fed. Reg. 1,210, 1,220 (Jan. 5, 2017).

[24]  The availability of this enforcement mechanism is a concrete concern; multiple covered entities filed ADR challenges to Novartis's contract pharmacy policies, which Chapter 103 also purports to govern. Novartis AG, *U.S. SEC Form 20-F 2024* F-45 (Jan. 30, 2025), https://tinyurl.com/5n7r3s45. HRSA has now adopted manufacturers' understanding of federal law. HRSA, *340B ADR Decision Summaries* (last updated May 15, 2025), https://tinyurl.com/2b9e24ec

98.     The Supreme Court has confirmed as much.  When a county that operated 340B covered entities sued manufacturers to enforce its interpretation of 340B pricing requirements, the Court held such suits were "incompatible with the statutory scheme."  *Astra*, 563 U.S. at 113.  It expressly adopted the Solicitor General's position regarding the federal 340B statute:  "Congress centralized enforcement" in the federal government, and allowing other entities to diffuse that power "would be inconsistent with that intent."  Brief for the United States as Amicus Curiae Supporting Petitioners at 32, *Astra USA, Inc. v. Santa Clara County*, 550 U.S. 110 (2011) (No. 09-1273), https://tinyurl.com/3h8numnj; *see also Astra*, 563 U.S. at 119.  Subverting that intent, moreover, "could spawn a multitude of dispersed and uncoordinated lawsuits," posing a "substantial" "risk of conflicting adjudications."  *Astra*, 563 U.S. at 120.

99.     The risk of conflicting adjudications here is profound.  Because Chapter 103 borrows most of its content from federal law, it cannot be enforced without answering several federal questions that HHS might—and in many cases likely would—answer differently.

100.    What would happen if the Maine Attorney General imposed liability for a transaction, but HRSA later determined in adjudicating an ADR claim that a manufacturer actually had *no* federal obligation to offer 340B pricing for the same transaction?  A manufacturer would suffer state sanctions for conduct federal law expressly permits.  That is exactly the "perfect collision of purposes" against which the First Circuit has recently warned.  *Maine Forest Prods.*, 51 F.4th at 10.  All the more so when the basis of the state rule is ostensibly *federal* law.  This "two bites at the apple approach necessarily conflicts with the federal process."  *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*, 589 F.3d 458, 474 (1st Cir. 2009); *see also Wood v. Gen. Motors Corp.*, 865 F.2d 395, 412 (1st Cir. 1988) (decrying state enforcement that "would destroy the uniformity of the federal standard").

101.    Another example:  Who counts as a patient of the covered entity?  The term "patient" is not expressly defined by the federal 340B statute, and HRSA's guidance on the subject is prolix and qualitative.  It requires consideration of whether a person "receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or Federally-qualified health center look-alike status has been provided to the entity" and whether the "only health care service received by the individual from the covered entity is the dispensing of a drug or drugs for subsequent self administration or administration in the home setting."  Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility, 61 Fed. Reg. 55,156, 55,157–58 (Oct. 24, 1996).  This issue, too, would determine whether any given prescription for which Novartis purportedly denied 340B pricing was improper under Maine law.  *See* 42 U.S.C. § 256b(a)(5)(B).

102.    Because penalties appear to be assessed on a per-prescription basis, 24-A M.R.S. § 7757(1), Chapter 103 will require Maine regulators to answer these solely federal questions to determine whether a manufacturer has violated the state statute.  That overlap alone is impermissible.  Worse, the potential for different decisionmakers—state and federal—to reach different conclusions is plain.  Chapter 103's enforcement provisions are thus "poised to upset" 340B's "'careful regulatory scheme established by federal law,'" "not least by potentially leading to conflicting adjudications."  *Morrisey*, 760 F. Supp. 3d at 459 (quoting *Geier*, 529 U.S. at 870).

103.    These are only examples of the thorny federal issues that Chapter 103 foists upon state decisionmakers.  Chapter 103 is so interwoven with federal questions that it is impossible even to explain what the state law requires without referring to federal law.

104.    Fracturing that interpretive power and doling it out to any jurisdiction that wishes to seize it is the antithesis of "Congress'[s] unitary administrative and enforcement scheme."

*Astra*, 563 U.S. at 120.  If every state enacted a law similar to Chapter 103, a cacophony of conflicting determinations on these fundamentally federal questions would become inevitable. This ultimately amounts to the forbidden power to "review and nullify" decisions by federal actors. *See Algonquin Lng v. Loqa*, 79 F. Supp. 2d 49, 52 (D.R.I. 2000).

105.    Chapter 103 also forbids manufacturers to "require a 340B entity to submit any claims or utilization data."  24-A M.R.S. § 7753(2).  That provision appears to foreclose the part of Novartis's contract pharmacy policy requiring "covered entities [to] upload their claims data" arising from permitted contract-pharmacy arrangements using an electronic platform. Ex. 1 (2025 Policy) at 1.  Novartis's policy requires this data because it is needed to "increase transparency, mitigate instances of duplicative discounts, and otherwise help maintain the integrity and sustainability of [the 340B] program."  *Id.*

106.    This prohibition on requiring claims data will also directly interfere with HRSA's nationwide administration of the 340B Program.  HRSA recently announced a pilot program in which manufacturers would be expected to require covered entities to provide claims data for certain drugs before manufacturers effectuate 340B pricing in the form of a rebate.  HRSA, 340B Program Notice: Application Process for the 340B Rebate Model Pilot Program, 90 Fed. Reg. 36,163 (Aug. 1, 2025).  HRSA may also expand this program to other drugs in the future.  *Id.* at  36,164.  But manufacturers evidently cannot participate in this rebate program in Maine without violating Chapter 103.  Not only is that a stark conflict between federal and state requirements, but it also underscores that Chapter 103 addresses subjects directly governed by federal law.  As federal administration continues to evolve, divergences like this will become more and more likely—further subverting Congress's centralized design for the 340B Program.

107.    Making claims data verboten is especially harmful to federal interests given the documented lack of 340B Program integrity under the status quo.  Unlawful duplication of discounts has become routine.  Mundra, *supra* n.18.  Lack of transparency or even access to basic information—a hallmark of the replenishment model—is a key contributor to those compliance failures.  *See, e.g.*, 340B House Report, *supra* n.17, at 36–37.  Contract pharmacy arrangements exacerbate the situation, as the federal government has found multiple times.  *E.g.*, GAO 2020 Report, *supra* ¶ 46, at 32–33; Contract Pharmacy Report, *supra* n.4, at 1–2.

108.    In this way, Chapter 103 impedes the federal effort to stop manufacturers from being forced to provide 340B pricing where they are not obliged to do so.  Compliance problems the federal government has identified as unlawful and attributed in part to unrestrained contract-pharmacy arrangements will persist because of Chapter 103.  That is a classic example of state law "stand[ing] as an obstacle to the accomplishment . . . of the full purposes and objectives of Congress." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (quotation omitted).  State law cannot prevent an outcome Congress intended to achieve.  *E.g.*, *Inmates of the R.I. Training Sch. v. Martinez*, 465 F. Supp. 2d 131, 141 (D.R.I. 2006) (holding preempted a state statute that would have withheld attorney's fees provided for by federal law).

109.    Chapter 103 also hinders federal efforts to remedy such noncompliance.  Federal regulation requires manufacturers' enforcement efforts to begin with information gathering.  If a manufacturer suspects a covered entity has violated statutory prohibitions and wishes to audit the entity, it must first amass "sufficient facts and evidence in support" of that concern.  Audit Guidelines, 61 Fed. Reg. at 65,410.  Only once it shows "reasonable cause" in this manner can a manufacturer initiate an audit.  *Id.*  And the manufacturer must complete an audit before it can

access ADR proceedings. 42 U.S.C. § 256b(a)(5)(C); 42 C.F.R. § 10.21(a)(2). Each part of the private federal enforcement scheme thus hinges on the first step: data collection.

110.    But manufacturers usually do not receive enough data under the replenishment model to clear that first hurdle. So a manufacturer lands in a catch-22: To get evidence that a covered entity violated the federal 340B statute, it must begin an audit, but it cannot begin an audit unless it has that evidence. That is among the problems Novartis's contract-pharmacy policy addresses. By requiring covered entities and their contract pharmacies to provide claims data as a condition of receiving 340B pricing, Novartis can use the federal enforcement scheme as Congress intended.

111.    It is irrelevant that Chapter 103 purports not to exempt covered entities from sharing claims data they *must* provide under federal law. 24-A M.R.S. § 7753(2). Courts have expressly recognized that federal law permits manufacturers to collect claims data. *Novartis*, 102 F.4th at 463; *Sanofi*, 58 F.4th at 701, 706. HRSA's new rebate pilot program reflects the same understanding. 90 Fed. Reg. at 36,164.

112.    Nor is it an answer to say that covered entities may provide claims data voluntarily, as Novartis has requested for several years. Unsurprisingly, most covered entities have refused to do so. Indeed, allowing covered entities—who "may be engaging in the kind of fraud that the 340B Program's alternative dispute resolution system is meant to prevent"—to decide whether to provide the very data that would support initiating an audit leaves manufacturers without much recourse. *Morrisey*, 760 F. Supp. 3d at 453. But the "340B Program certainly did not establish a system where the fox guards the hen house." *Id.*

113.    If Chapter 103 succeeds in keeping manufacturers in the dark regarding contract pharmacies' reasons for claiming 340B pricing, these enforcement mechanisms will remain largely

illusory.  At the same time, Chapter 103 will make federal enforcement mechanisms all the more important:  Forcing Novartis to provide millions of dollars in discounts without requiring basic documentation demonstrating that the party met the criteria to obtain them amounts to inviting fraud.  No business would choose to operate this way, and for good reason.  Chapter 103 therefore "create[s] an obstacle to twin federal purposes—providing [340B prices] to covered entities only *and* prohibiting fraud through duplicate discounts."  *Morrisey*, 760 F. Supp. 3d at 452.  That is the essence of what the Supremacy Clause forbids.

## IV.    Chapter 103 Violates The Dormant Commerce Clause.

114.    Chapter 103 also violates the dormant Commerce Clause.  The Commerce Clause grants Congress the power to regulate commerce among the several states.  U.S. Cont. art. I, § 8, cl. 3.  That power carries with it a "negative" or "dormant" restriction:  Even when Congress has not exercised its commerce power, states may not "interfere with or impose burdens on interstate commerce."  *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 389 (1983) (citation omitted).  Statutes that purport to do so may not be enforced.

115.    There are three main flavors of dormant Commerce Clause violations.  A state law cannot stand if it: (1) discriminates against interstate commerce in favor of in-state commerce; (2) regulates extraterritorial transactions; or (3) imposes excessive burdens on interstate commerce.  *National Pork Producers Council v. Ross*, 598 U.S. 356, 369, 376 n.1, 377–378 (2023).  Chapter 103 does all three.

## Chapter 103 Operates Extraterritorially.

116.    Novartis is not located in Maine.  Distribution of 340B-eligible drugs from Novartis to individual pharmacies in Maine necessarily takes place through a complex series of interstate transactions.  Novartis typically enters into nationwide contracts to sell its medicines to

wholesalers and distributors at commercial prices. The wholesalers and distributors then sell to national chain pharmacies before the products are ultimately distributed to and dispensed by an in-state contract pharmacy out of its common inventory.

117. Under retroactive pricing models, the 340B discount later is claimed through a new transaction chain: For example, once a contract pharmacy's third-party administrator has purported to identify a certain number of allegedly 340B-eligible transactions, it may submit a "replenishment" claim to the wholesaler. The wholesaler would then arrange for the covered entity to be billed at the 340B price for the relevant number of units (whether or not it ships new product to the contract pharmacy). The wholesaler next requests a refund from the manufacturer, and the manufacturer fulfills its purported 340B pricing obligation by paying the refund.

118. Chapter 103 regulates manufacturers, not wholesalers, and broadly states that manufacturers may not even "*indirectly*" "deny, restrict, prohibit, *or otherwise interfere with*" a contract pharmacy from receiving 340B-priced product. 24-A M.R.S. § 7753(1) (emphases added). But manufacturers give the discount to wholesalers, and both of these entities are typically located outside of the state. Chapter 103 therefore sets the terms of a wholly out-of-state transaction between non-Maine entities.

119. The dormant Commerce Clause prohibits this kind of extraterritorial regulation. States may not directly regulate the price of transactions "beyond the boundaries of the State." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989). For this reason, the Fourth Circuit invalidated a Maryland law that prohibited drug manufacturers or wholesale distributors from imposing "an unconscionable increase in the price of a prescription drug." *Association for Accessible Medicines v. Frosh*, 887 F.3d 664, 666 (4th Cir. 2018). As the Fourth Circuit recognized, the Maryland Act effectively sought to enforce Maryland law outside the state because it targeted the "price the

manufacturer or wholesaler charge[d] *in the initial sale of the drug*," rather than the "the price the . . . consumer ultimately pays." *Id.* at 671.

120.    The Eighth Circuit recently reaffirmed the same principle.  Minnesota passed a drug-pricing law that applied only to manufacturers, not wholesalers.  *Association for Accessible Meds. v. Ellison*, 140 F.4th 957, 959 (8th Cir. 2025).  The Eighth Circuit noted that the unique nature of pharmaceutical distribution rendered the state law in violation of the dormant Commerce Clause.  The law targeted out-of-state sales by a manufacturer to a wholesaler where the drugs are sold "at prices above those proscribed by the [state law] and those drugs later ended up in [the state]." *Id.* at 960.  This is the "specific impermissible extraterritorial effect of controlling prices" that the Supreme Court has repeatedly held unlawful, and so the Eight Circuit affirmed an injunction of the Minnesota law.  *Id.* at 961–962.

121.    Chapter 103 works exactly the same way.  It forces a manufacturer to provide a discount to its wholesaler to effectuate 340B pricing.  The state law therefore impermissibly "insists that out-of-state manufacturers sell their drugs to wholesalers for a certain price." *Ellison*, 140 F.4th at 961.

122.    The First Circuit, too, has recognized this problem.  The court has explained that drug-pricing laws exceed constitutional limits if they "involve regulating the prices charged in the home state and those charged in other states in order to benefit the buyers and sellers in the home state." *Pharmaceutical Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 81 (1st Cir. 2001), *aff'd on other grounds*, 538 U.S. 644 (2003).  Although it found no violation in *Concannon*, the First Circuit expressly distinguished a law like Chapter 103—one that would "insist that manufacturers sell their drugs to a wholesaler for a certain price." *Id.* at 81–82.  Chapter 103 orders manufacturers to provide 340B pricing to wholesalers on particular transactions, meaning that Novartis must "act

40

in accordance with [Maine] law, regardless of where the underlying conduct at issue" occurs. *Rhode Island Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*, 642 F. Supp. 3d 218, 223 (D.R.I. 2022), *aff'd in part*, 92 F.4th 330 (1st Cir. 2024). That is extraterritorial control and thus unlawful.

**Chapter 103 Discriminates Against Interstate Commerce.**

123.    Chapter 103 also violates the dormant Commerce Clause by offering a significant economic boost to in-state pharmacies at the expense of Novartis and other drug manufacturers like it. States may not engage in this kind of "economic protectionism" by enacting regulations to benefit in-state economic interests at the expense of out-of-state competitors. *Pork Producers*, 598 U.S. at 357. State laws that discriminate against "nonresident economic actors," are invalid unless they are narrowly tailored to a legitimate local purpose. *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019); *see also Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (discriminatory laws are "virtually *per se* invalid").

124.    By forcing out-of-state manufacturers to give steep discounts on drugs that end up in Maine pharmacies, Chapter 103 impedes interstate commerce. The "fundamental objective" of the dormant Commerce Clause is to preserve a competitive national market "undisturbed by pref-erential advantages" to in-state interests. *General Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). Out-of-state manufacturers like Novartis operate within the same chain of distribution as in-state contract pharmacies and covered entities, selling the same products to a "single market" of healthcare consumers and competing vertically for a share of the profit. *Id.* at 300; *see also Trailer Marine Transport Corp. v. Rivera Vazquez*, 977 F.2d 1, 11 (1st Cir. 1992) (in-state and out-of-state interests can be comparable under the dormant Commerce Clause even if they "indi-rectly compete" and are not "direct business rivals"). Chapter 103 seeks to disrupt that balance,

41

forcing out-of-state manufacturers to subsidize in-state entities that Congress did not see fit to make beneficiaries of the federal 340B program.

125.    Chapter 103's goal is to generate more revenue for in-state pharmacies and covered entities by forcing out-of-state manufacturers to give them steep discounts beyond what is required of them under the federal 340B program.  This point was made clear by the sponsor of the bill that ultimately became Chapter 103:  "This legislation ensures that more of the money we Mainers pay – [*sic*] stays in Maine, and is not sent to large, multi-national and out-of-state to [*sic*] for-profit pharmaceutical companies."  Sen. Bailey Testimony, *supra* ¶ 68, at 3.

126.    Animus against "out-of-state" entities does not get much clearer than that.  But preventing such animus from setting state policy is precisely why the dormant Commerce Clause exists.  *American Trucking Ass'ns, Inc. v. Rhode Island Tpk. & Bridge Auth.*, 123 F.4th 27, 37 (1st Cir. 2024); *see also Northeast Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542, 553 (1st Cir. 2022) ("The destructive consequences of allowing states to exercise an unfettered power to discriminate against each other's industry have been of great concern since the Founding.").

127.    Nor is there a legitimate justification for Maine to discriminate against out-of-state manufacturers.  The benefits from unlimited contract pharmacy arrangements do not run to patients or the public.  *Supra* ¶¶ 7, 13, 38–39, 43 (explaining that almost all patients pay the same prices irrespective of whether their prescriptions are later used to claim 340B pricing).[25]  Novartis,

---

[25] *See also, e.g.*, Rena M. Conti & Peter B. Bach, *The 340B Drug Discount Program: Hospitals Generate Profits By Expanding To Reach More Affluent Communities*, 33(10) H. Aff. 1786 (Oct. 2014) ("Our findings are consistent with recent complaints . . . suggesting that the 340B program is being converted from one that serves vulnerable communities to one that enriches participating hospitals and the clinics affiliated with them."), https://tinyurl.com/ycxatjb7.

through its wholesalers, *already delivers* the very same drug products to the very same pharmacies, which routinely dispense them without regard to whether a customer is a patient of a 340B covered entity.  Chapter 103 governs only the price of the sale to the covered entity and contract pharmacy (not to the customer, who pays her insurance company's predetermined copay).  Further, as more and more contract entities take advantage of these types of statutes—as has already been occurring—the revenue generated from the 340B discount falls increasingly in the hands of for-profit pharmacies and third-party administrators.  *See, e.g.*, Minnesota Dep't of Health, *supra* n.7, at 9.  Other, more targeted means, such as direct grants to hospitals and pharmacies, would better support these entities without discriminating against interstate commerce.

**Chapter 103 Impermissibly Burdens Interstate Commerce.**

128.    Chapter 103 likewise fails under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  The bill forcibly shifts the bargaining power along the distribution chain by requiring out-of-state drug manufacturers to subsidize in-state industries.  The substantial burden it imposes on interstate commerce is excessive compared to the purported local benefits.  *See, e.g.*, *National Rev. Corp. v. Violet*, 807 F.2d 285, 289–290 & n.5 (1st Cir. 1986).

129.    By meddling with what was meant to be a national drug-pricing program, Chapter 103 ratchets up administrative burdens on manufacturers and wholesalers, who must now make state-specific exceptions to formerly national contract pharmacy policies if they wish to remain in compliance with this patchwork of state laws.  This lack of uniformity in state laws falls entirely on non-Maine entities—a direct burden on shipping drugs into the state.  And the Court must also consider the burden that would arise if "many or every, State adopted similar legislation."  *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992) (quoting *Healy*, 491 U.S. at 336).  "If every state . . . [were] allowed to express an opinion" on the appropriate functioning of the 340B Program, the

resulting jumble would "place an undue burden on interstate commerce." *De Jesus v. American Airlines, Inc.*, 532 F. Supp. 2d 345, 353 (D.P.R. 2007).

130.    That is no longer a hypothetical problem for the 340B Program.  Chapter 103 and other state laws like it collectively unleash havoc on nationwide drug distribution.  Novartis typically sells its products by entering into nationwide contracts with wholesalers and distributors, which in turn contract with pharmacies down the distribution chain.  State-specific pricing laws like Chapter 103 impose conflicting requirements on drug manufacturers and their wholesalers and distributors, balkanizing drug distribution and driving up administrative costs by making it impossible to maintain contractual terms that apply nationwide.  Manufacturers, wholesalers, and distributors must wade through this deepening mire that increasingly threatens to transform nationwide drug distribution into a litany of state-specific distribution systems.

131.    The burden on interstate drug distribution continues to increase as more and more states enact their own versions of 340B laws.  Already, Arkansas, Colorado, Kansas, Louisiana, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Utah, and West Virginia have enacted similar laws.[26] One does not need to be an expert in drug distribution to see the problem.  *See Frosh*, 887 F.3d at 673 (holding that a drug-pricing statute disproportionately burdened interstate commerce when it had "the potential to subject prescription drug manufacturers to conflicting state

---

[26] Arkansas (Ark. Code § 23-92-601 *et seq.*); Colorado (Colo. R.S. § 6-29-101 *et seq.*); Hawaii (H.B. 712 (2025)); Kansas (Kan. Stat. § 65-483); Louisiana (La. Rev. Stat. § 40:2883); Maryland (H.B. 1056 (2024)); Minnesota (H.F. 4991 (2024)); Mississippi (Miss. Code § 75-24-5); Missouri (H.B. 728 (2024)); Nebraska (Neb. L.B. 168, § 3(1) (2025)); New Mexico (N.M. H.B. 78 (2025)); North Dakota (N.D. Cent. Code § 43-15.3-08); Oklahoma (Okla. Stat. tit. 36, § 5400–04); Oregon (H.B. 2385 (2025)); Rhode Island (S.B. 114 (2025)); South Dakota (S.B. 154 (2025)); Tennessee (S.B. 1414 (2025)); Utah (Utah Code § 31A-46-311); Vermont (H.266 (2025)); and West Virginia (W. Va. Code § 60A-8-6a).

requirements"). This is exactly the compounding burden on interstate commerce that the dormant Commerce Clause prohibits.

**V.      Chapter 103 Will Cause Novartis Imminent, Irreparable Harm.**

132.    Novartis will be irreparably harmed if Chapter 103 is enforced.

133.    Chapter 103 puts Novartis in a lose-lose situation.  Complying with the law will require Novartis to expend significant resources to satisfy requirements imposed by an unconstitutional law.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  There is no way for Novartis to recover these compliance costs, and as more and more states enact similar 340B laws, the administrative burden to comply with each law will only increase.

134.    Being subject to an unconstitutional law is itself a significant irreparable harm. *Maine Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 63 (D. Me. 2022) (Supremacy Clause), *aff'd*, 51 F.4th 1 (1st Cir. 2022); *Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997) (dormant Commerce Clause).  That is especially so here, where Chapter 103 undermines Novartis's ability to rely on rights conferred by federal law to structure its conduct.  *See Novartis*, 102 F.4th at 463–464; *Sanofi*, 58 F.4th at 703–706.

135.    Beyond that, Chapter 103 will cause Novartis to lose millions of dollars as it provides discounted prices that the federal statute does not require it to offer.  In many instances, these discounts will violate the federal statute's prohibitions on duplication or diversion.

136.    Maine cannot be held directly liable for these damages because it is protected by sovereign immunity.  Faced with "a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel."  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18–19 (1st Cir. 1996); *see also Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003) (noting the plaintiff's inability to recover

damages from Puerto Rico); *Massachusetts Fair Hous. Ctr. v. United States Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 611 (D. Mass. 2020) (unrecoverable compliance costs).

137.    Failing to comply with Chapter 103, on the other hand, exposes Novartis to costly enforcement actions and severe penalties.  Novartis could be subject to fines of up to $10,000 for each violation.  *See* 24-A M.R.S. § 7757(1); 5 M.R.S. § 209.  Regardless of the penalty imposed, any enforcement action will require Novartis to expend significant resources defending itself or its employees.  None of those sanctions or costs could ever be recovered.  And "significant monetary penalties" that cannot ever be recovered result in "obvious" irreparable harm.  *A-R Cable Servs. - ME, Inc. v. FCC*, No. 95-CV-134, 1995 WL 283861, at *2 (D. Me. May 10, 1995).

138.    Whether or not Novartis complies with Chapter 103, it must divert substantial resources from research and development of new drug therapies.  Those opportunity costs, too, can never be regained.

139.    Injunctive relief will preserve the status quo and cause Defendant no harm.  Maine "has no interest in enforcing an unconstitutional law, and the public interest is harmed by the enforcement of laws repugnant to the United States Constitution."  *Tirrell v. Edelblut*, 747 F. Supp. 3d 310, 319 (D.N.H. 2024) (quotation omitted and alteration adopted).  And even if Defendant were to prevail on the merits, any harm "from the delay imposed by a federal injunction" would be "minimal."  *Arcadian Health Plan, Inc. v. Korfman*, No. 1:10-CV-322, 2010 WL 5173624, at *9 (D. Me. Dec. 14, 2010) (quotation omitted), *aff'd*, 2011 WL 22974 (D. Me. Jan. 4, 2011).

140.    Injunctive relief will also serve the public interest by maintaining the integrity of a carefully planned federal program.  *See, e.g.*, *Arcadian Health Plan*, 2010 WL 5173624, at *9 ("Where Congress has expressly preempted the state law at issue, Congress has already determined that it is the preempting federal law that serves the public interest."); *United States v. Alabama*,

691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest.").  Likewise, the public has an "interest in ensuring that the Constitution is upheld and that unjustifiable restrictions are not placed on the free flow of interstate commerce." *Stephen D. DeVito, Jr. Trucking, Inc. v. Rhode Island Solid Waste Mgmt. Corp.*, 770 F. Supp. 775, 779 (D.R.I.), *aff'd*, 947 F.2d 1004 (1st Cir. 1991); *see also Maine Forest Prods.*, 586 F. Supp. 3d at 64 ("[T]he public has a . . . strong interest in ensuring the constitutionality of state laws.").

141.    The public will also benefit from an injunction ensuring Novartis can direct its resources where they are most needed: researching and developing new drug therapies for patients.

## COUNT I
### (Federal Field Preemption | U.S. Const. art. VI, cl. 2)

142.    Novartis realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully herein.

143.    Federal law is "the supreme Law of the Land; . . . any Thing in the . . . Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

144.    Congress has determined that the federal 340B Drug Pricing Program must be regulated by its exclusive governance.  The obligations imposed by the federal 340B statute—and just as importantly, those *not* imposed by the federal 340B statute—are a critical part of Congress's overall involvement in the nationwide pharmaceutical market.  States are not free to reconfigure that level of involvement, regardless of whether they perceive Congress's limits as "silence."

145.    Consistent with the 340B Program's exclusively federal domain, the federal 340B statute contains a pervasive framework of federal regulation including an exhaustive definition of the types of entities that are eligible for discounted prices, limitations on when those entities can receive discounted pricing, limitations on what those entities can do with discounted drugs, and a

comprehensive remedial scheme that provides for federal enforcement and private ADR claims under the oversight of a federal agency.

146.    The federal interest in regulating 340B-priced drugs is also so dominant that Congress's statutory scheme precludes state regulation covering the same subject.  As the Supreme Court has already recognized, state attempts to interfere in this realm are "incompatible with the [340B] statutory regime." *Astra*, 563 U.S. at 113.

147.    Chapter 103 expressly targets the field of "the federal 340B drug discount program." *See, e.g.*, 24-A M.R.S. § 7752(7).  Each of its provisions implicates a legislative field that Congress has reserved for its exclusive governance.

148.    Chapter 103 therefore violates the Supremacy Clause of the U.S. Constitution.

**COUNT II**
**(Federal Conflict Preemption | U.S. Const. art. VI, cl. 2)**

149.    Novartis realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully herein.

150.    Chapter 103 repeatedly frustrates the purposes of multiple federal statutes and interferes with the methods by which those federal statutes attempt to achieve their goals.

151.    Chapter 103 directly regulates drug pricing by requiring Novartis to provide a discounted price on drugs delivered to an unlimited number of contract pharmacies.

152.    In this way, Chapter 103 requires Novartis to offer deeply discounted pricing in situations where the federal 340B statute does not, and therefore expands the size of the federal 340B Drug Pricing Program, imposing requirements more onerous than those of federal law.

153.    Chapter 103 purports to overwrite several tradeoffs Congress made in passing the federal 340B statute.  Chapter 103 interferes with federal objectives and methods by: preventing Novartis from exercising its federal-statutory discretion to set reasonable conditions on 340B

pricing; forcing Novartis to provide 340B pricing for more products; fracturing the federal statute's centralized enforcement scheme; creating a risk of conflicting adjudications of federal law; undermining the effectiveness of federal enforcement mechanisms by denying Novartis data it needs to use them effectively; and perpetuating rampant noncompliance with the federal prohibitions on duplication and diversion.

154.    Chapter 103 therefore violates the Supremacy Clause of the U.S. Constitution.

## COUNT III
### (Dormant Commerce Clause | U.S. Const. art. I, § 8, cl. 3)

155.    Novartis realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully herein.

156.    Under the Commerce Clause, Congress has the power to regulate commerce among the several states.  U.S. Const. art. I, § 8, cl. 3.  The corresponding "dormant" Commerce Clause prevents states from imposing regulations that discriminate against interstate commerce, unduly burden it, or regulate commerce occurring entirely out of state.

157.    Chapter 103 violates the dormant Commerce Clause by regulating wholly out-of-state transactions between drug manufacturers like Novartis and out-of-state wholesalers.

158.    Chapter 103 also intentionally discriminates against interstate commerce by benefitting in-state healthcare providers and pharmacies at the expense of out-of-state manufacturers. This blatant economic protectionism violates the dormant Commerce Clause.

159.    There is no legitimate local purpose for discriminating against out-of-state manufacturers like Novartis, and even if there were, Maine has other, less burdensome means available to advance that purpose.

160.    Chapter 103 additionally fails the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  This Maine law and others like it impose a substantial harm on

interstate commerce by imposing burdensome and conflicting requirements on drug manufacturers that impede the national distribution of pharmaceutical drugs. The burden on interstate commerce is clearly excessive in relation to the purported local benefit and will only continue to increase as more states enact their own state 340B programs.

161.    Chapter 103 therefore violates the Commerce Clause of the U.S. Constitution.

**PRAYER FOR RELIEF**

For the foregoing reasons, Novartis prays for the following relief:

A.    A declaration under 28 U.S.C. § 2201 that Chapter 103 is preempted by federal law and is thus null, void, and unenforceable;

B.    A declaration under 28 U.S.C. § 2201 that Chapter 103 violates the dormant Commerce Clause and is thus null, void, and unenforceable;

C.    Preliminary and permanent injunctive relief vacating Chapter 103 and enjoining Defendant from implementing or enforcing Chapter 103 against Novartis or any of its affiliates, officers, agents, representatives, or contractors;

D.    Preliminary and permanent injunctive relief enjoining Defendant from seeking civil penalties, equitable relief, or any other remedy arising from an alleged violation of Chapter 103 by Novartis or any of its affiliates, officers, agents, representatives, or contractors;

E.    An order awarding Novartis its costs, expenses, and attorney's fees incurred in these proceedings; and

F.    Such other and further relief as the Court deems proper.

Dated: August 7, 2025

Respectfully submitted,

/s/ Matthew Warner
Matthew Warner
Alexandra Harriman
PRETIFLAHERTY
45 Memorial Circle,
Augusta, ME 04330
Telephone: (207) 623-5300
mwarner@preti.com


Susan Cook*
Jessica L. Ellsworth*
Alexander V. Sverdlov*
Marlan Golden*
Jacob T. Young*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
susan.cook@hoganlovells.com

*Attorneys for Plaintiff Novartis
Pharmaceuticals Corporation*

*Motion for admission pro hac vice forthcoming*

**VERIFICATION**

I, the undersigned, having read the allegations of the foregoing Verified Complaint, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the factual allegations asserted in the Verified Complaint are true and correct.

Executed this 7th day of August 2025.

> */s/ Shannon McCrudden*
> Shannon McCrudden
> Vice President of Managed Markets
> Finance, Novartis Pharmaceuticals
> Corporation